## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 02 2018, 5:28 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Lee Money
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Timothy S. Shelly
Matthew W. Schramm
Warrick & Boyn, LLP
Elkhart, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Michael James Tollar, *Appellant-Respondent,* <br><br> v. <br><br> Saige Marie Swank, *Appellee-Petitioner* | November 2, 2018 <br><br> Court of Appeals Case No. 18A-DR-849 <br><br> Appeal from the Elkhart Superior Court <br><br> The Honorable David C. Bonfiglio, Judge <br><br> Trial Court Cause No. 20D06-0303-DR-137 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Michael James Tollar ("Father") appeals the trial court's order requiring him to pay his share of his son's post-secondary education expenses. Father contends that the trial court erred in concluding that his son had not repudiated his relationship with Father. We affirm.

# Facts and Procedural History

[2] During the marriage of Father and Saige Swank ("Mother"), the parties had two children, including M.S.T. ("Son"), who was born in 1997. Son was later diagnosed with a sensory integration disorder that "require[d] significant and consistent care." Appellant's App. Vol. II p. 10. In 2004, Father and Mother's marriage was dissolved by a Decree of Dissolution of Marriage which ordered post-secondary education expenses for the children to be divided as follows:

> . . . scholarships and grants shall first be deducted from the
> education expenses . . . [t]hereafter, the child shall be responsible
> for twenty-five percent (25%) of the remaining expenses, and the
> balance shall be divided between the parties in proportion to their
> respective weekly adjusted income.

*Id.* at 14. In September 2016, after Mother received a bill for Son's first semester of college, she filed a petition asking that Father be ordered to pay his share of Son's post-secondary education expenses. In response, Father filed a petition to modify child support regarding post-secondary education expenses. Father asserted in his petition that Son had repudiated him and asked to be

released from all financial obligations for post-secondary education expenses for Son. In February 2018, the trial court held a fact-finding hearing regarding post-secondary education expenses.

[3] At the hearing, Mother testified that after her divorce from Father in 2004, Father visited Son "three or four times within [the] year following the divorce; and then, stopped visiting." Tr. p. 14. Mother said that between 2005 and 2017, Father never called Son or sent him birthday or holiday cards. Mother testified that she has had the same telephone number since 2004 and that she and Son lived in the home that she had shared with Father until 2015. Mother stated that after she filed the petition for post-secondary education expenses, Father sent Son a series of Facebook messages.

[4] Father testified that he visited Son a couple of times in 2005 and had occasional visits with Son that ended in either 2008, 2012, or 2013. Father testified that he "sent a letter, a little card or something in the early years" but not "every birthday [or] every Christmas." *Id.* at 33. Father stated that in February 2017, he and Son "had a limited exchange on Facebook" and that they "went back and forth for a week, ten days" and Son "refused to get on the phone." *Id.* at 38-39. Father said that after Son told him that he did not want to speak on the phone, "[Father] asked [Son] is it okay if we just keep . . . [using] Facebook" and Son said "sure." *Id.* at 50. Father testified that eventually he and Son stopped communicating because Son blocked him on Facebook.

[5]     Son testified that the last time he remembered Father visiting him was in 2008, and that Father's visits were "really infrequent." *Id.* at 70. Son said that he "never once remember[ed] receiving any sort of Christmas or birthday card [from Father]." *Id.* Son testified that he and Father had a "two-week long exchange" on Facebook in February 2017. *Id.* at 71. Son said that Father "was really insistent on trying to get [his] phone number. And [he] didn't feel comfortable with that. [He] wanted to just work through Facebook[.]" *Id.* Son also testified that Father sent him "really, really, long drawn out YouTube videos" that "were around three hours each." *Id.* at 72. Son said the YouTube videos "came across really creepy" and made him "really uncomfortable." *Id.* Son testified that toward the end of their Facebook exchange Father told him that he was thinking of hiring a private investigator to find out Son's information. Son stated:

> That really freaked me out. And I think toward the end, [Father] eventually said, look, I don't want to talk anymore. I . . . want your phone number. That's how we're going to continue this conversation. And then, I was like, well, then, for now, we're not . . . continuing this conversation. And then, I blocked [Father] on Facebook.

*Id.* at 73. Son testified that "[he] would love to know [Father]" and "would be fine with [Father] sending [him] a letter." *Id.* at 74, 77.

[6]     Following the hearing, the trial court took the matter under advisement and asked the parties to submit written final arguments. In March 2018, the trial

court issued an order finding "that [Son] ha[d] not repudiated his [F]ather." Appellant's App. Vol. II p. 2. The trial court reasoned:

> [Son's] behaviors in this matter are not ones of repudiation of his [F]ather, but rather simply protecting his mental health, his sense of well[-]being and concern for his personal safety. [Son's] actions and those beliefs are absolutely reasonable based on the context for [F]ather's contacts with [Son]. . . . Father's aggressive manner of communications through their limited experience on Facebook; [F]ather's three hour [You]-Tube videos to [Son] wherein [F]ather testifies to his unending love for [Son]; [F]ather's insistence on attaining [Son's] phone number; [F]ather threatening to hire a private detective to track down [Son's] personal information and [F]ather's dictatorial questioning of [Son] all appear to be near stalking of [Son] by [F]ather, all justify [Son's] guarded response to his [F]ather. [Son] was simply "freaked out" by his [F]ather's behaviors and [Son] concluded that the behaviors were "creepy." Rather than repudiation, [Son] had longed for a normal relationship with his [F]ather[.]

> Father has all but abandoned [Son] on an emotional level all of [Son's] life, [F]ather's brief communication with [Son] in which [F]ather assumed an imposing parental relationship did not play well with [Son] for good reason. It is unknown how [Son's] Sensory Integration Disorder may have affected [Son's] response which does not appear to have even been a consideration by [F]ather. Father's behaviors were simply inappropriate[.]

*Id.* at 2-3. The trial court therefore ordered Father to pay his share of Son's post-secondary education expenses as required by the divorce decree.

[7] Father now appeals.

# Discussion and Decision

[8] Father contends that "the evidence does not support the trial court's finding that [Son] had not repudiated his relationship with [Father]." Appellant's Br. p. 4. On appeal, we do not reweigh the evidence; instead, we consider first whether the evidence supports the findings and then whether the findings support the judgment. *Kahn v. Baker*, 36 N.E.3d 1103, 1113 (Ind. Ct. App. 2015), *trans. denied.* Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. *Id.* But we do not defer to conclusions of law, and a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id.* at 1112.

[9] Repudiation is defined as a complete refusal to participate in a relationship with the parent. *Id.* Indiana law provides that a court may enter an educational support order for a child's education at a post-secondary educational institution, but repudiation of a parent by a child is recognized as a complete defense to such an order. *Id.*; *see also* Ind. Code § 31-16-6-2(a)(1). When a child who is over eighteen repudiates a parent, that parent must be allowed to dictate what effect this will have on his contribution to college expenses for that child. *Kahn,* 36 N.E.3d at 1113. A finding of repudiation is fact sensitive. *Id.*

[10] As detailed above, the trial court was presented with significant evidence that contradicts Father's claim that Son chose to end their relationship. The trial court made numerous findings regarding the aggressive way Father attempted to establish communication with Son after nearly a decade of mostly silence.

As the trial court noted, Son suffers from a sensory integration disorder and this may have caused him to perceive Father's behaviors as "creepy." Appellant's App. p. 2. Even so, Son wanted to communicate but Father was "insistent on trying to get [Son's] phone number" and told Son that they were only going to communicate by phone. Tr. p. 71. The trial court also found that Son was "freaked out" by Father's threat to hire a private investigator and Son's blocking Father on Facebook was a reasonable response to his Father's threat. *Id.* at 73. Still, Son testified that "[he] would love to know Father" and is open to maintaining a relationship with Father. *Id.* at 74. There is ample evidence in the record that supports the trial court's conclusion that Son's behavior after turning eighteen did not constitute "a complete refusal to participate in a relationship" with Father. *See Kahn*, 36 N.E.3d at 1112. Accordingly, we find that the trial court did not err when it found that Son had not repudiated Father.

[11] Affirmed.

Riley, J., and Kirsch, J., concur.